UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SONERA HOLDING B.V.,                    :
                      Petitioner,       :
                                        :    11 Civ. 8909 (DLC)
          -v-                           :
                                        :    OPINION AND ORDER
ÇUKUROVA HOLDING A.Ş,                   :
                      Respondent.       :
                                        :
----------------------------------------X

APPEARANCES:

For the petitioner:
Pieter Van Tol
Andrew Behrman
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022

For respondent:
David M. Lindsey
James M. Hosking
Chaffetz Lindsey LLP
505 Fifth Avenue, 4th Floor
New York, NY 10017

DENISE COTE, District Judge:

        Petitioner Sonera Holding B.V. ("Sonera") seeks

confirmation of a foreign arbitral award.  Respondent Çukurova

Holding A.Ş. ("Çukurova") resists confirmation, citing the

absence of personal jurisdiction, forum non conveniens, and

irregularities in the Swiss arbitration.  For the following

reasons, the petition for confirmation is granted.

BACKGROUND

Sonera is organized under the laws of the Netherlands; Çukurova is a joint stock corporation organized under the laws of the Republic of Turkey.  The parties entered into a letter agreement dated March 25, 2005 ("Letter Agreement").  Section 5.4 of the Letter Agreement contained an arbitration clause, which reads in relevant part:

> Any dispute, controversy or claim arising out of or in connection with this Agreement . . . shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce (the "ICC Rules"), except as such ICC Rules may be modified below.
>
> (a)   The place of arbitration shall be Geneva, Switzerland . . . .
>
> [ . . . ]
> (d)   Any award of the arbitral tribunal shall be final and binding on the Parties.  The Parties hereby waive any rights to appeal any arbitration award to, or seek determination of any question of law arising in the course of arbitration from, jurisdictional courts.
> (e)   Any award of the arbitral tribunal may be enforced by judgment or otherwise in any court having <u>jurisdiction of the award</u> or over the person or the assets of the owing Party or Parties.  Applications may be made to such court for judicial recognition of the award and/or an order for enforcement, as the case may be.

(Emphasis supplied.)

Sonera commenced arbitration under the ICC Rules on May 27, 2005.  The principal issue of the first phase of the arbitration

2

concerned whether the parties had concluded a share purchase agreement requiring the delivery of shares by Çukurova in Turkcell Holding A.Ş., a joint stock corporation that owns a controlling stake in Turkcell İletişim Hizmetleri A.Ş. ("Turkcell"), the operator of the largest mobile telephone service in Turkey, or whether the Letter Agreement had lapsed. During this phase of the arbitration, the tribunal addressed several objections to jurisdiction interposed by Çukurova.

On January 15, 2007, the tribunal rendered the First Partial Award, finding that it had jurisdiction and ordering Çukurova to sell shares to Sonera.  When Çukurova failed to sell the shares to Sonera, the arbitration entered a second phase.

On July 29, 2009, the tribunal issued the Second Partial Award, ordering Çukurova to deliver the shares to Sonera and determining that the value of the shares as of July 30, 2007, was $1.8 billion in excess of the original $3.1 billion purchase price.

By letter of November 19, 2009, Sonera advised the tribunal that it waived its claim for delivery of the shares and sought damages for non-delivery.  After a hearing on September 13 and 14, 2010, the tribunal issued a Final Award on September 1, 2011.  In the Final Award, Çukurova was ordered to pay Sonera

$932 million in damages for its failure to deliver the shares, with interest and costs.

On October 4, 2011, Sonera demanded payment.  Sonera also commenced proceedings to enforce the Final Award.  On October 4, it filed an application for enforcement in the British Virgin Islands; on October 14, in Switzerland and the Netherlands; and on October 17 in the Netherlands Antilles.  Çukurova has opposed all efforts to confirm the Final Award.

Çukurova acknowledges that it cannot apply to Swiss courts to set aside the Final Award because the parties waived such rights in the Agreement.  Çukurova did initiate its own arbitration in Switzerland on April 10, 2012, however, to obtain a refund of any amount to be paid pursuant to the Final Award. Sonera represents that it will commence an action in Turkey to enforce the Final Award after those Swiss proceedings have concluded.  To date, Sonera has not been able to obtain any recovery on the Final Award.

On December 6, 2011, Sonera initiated this action seeking confirmation of the Final Award in the Southern District of New York.  Service was completed in accordance with the Hague Convention on March 13, 2012, and a March 16 Order set a briefing schedule for Sonera's petition to confirm the Final Award.  The petition was fully submitted on June 1.

4

DISCUSSION

This petition for confirmation invokes the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") as implemented by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 et seq.  The FAA provides that a court confronted with a motion to confirm an arbitral award governed by the New York Convention "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. § 207.  "The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies."  Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 90 (2d Cir. 2005).  This is a heavy burden, as there is a strong public policy in favor of international arbitration.  Id.  Furthermore, the Court's review of arbitral awards pursuant to the Convention is "very limited in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  Id. (citation omitted).

Çukurova resists enforcement of the Final Award with three arguments.  It contends that this Court lacks personal jurisdiction over it; that there are two grounds under the

5

Convention that prevent enforcement of the Final Award; and that the petition should be denied under the doctrine of forum non conveniens.

1. Personal Jurisdiction

Çukurova contends that there is no personal jurisdiction over Çukurova under either New York's long arm statute or pursuant to the Due Process Clause.  To confirm a foreign arbitral award pursuant to the New York Convention, a court is required to have personal or quasi in rem jurisdiction over the parties.  Frontera Resources Azerbaijan Corp. v. State Oil Company of the Azerbaijan Republic, 582 F.3d 393, 397 (2d Cir. 2009).  Because a petition to confirm an arbitral award is "treated as akin to a motion for summary judgment," D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 109 (2d Cir. 2006), Sonera must establish that the undisputed facts in the petition and the accompanying record support personal jurisdiction by a preponderance of the evidence.  See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

Under New York's long-arm statute, personal jurisdiction exists over a foreign corporation that is doing business in the state "not occasionally or casually, but with a fair measure of permanence and continuity."  Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000) (citation omitted); N.Y.

C.P.L.R. 301 (codifying caselaw that incorporates "doing business" standard).  A fact-specific inquiry is necessary to determine whether a corporation's contacts with New York demonstrate "continuous, permanent and substantial activity." Wiwa, 226 F.3d at 95 (citing Landoil Res. Corp. v. Alexander & Alexander Servs., 918 F.2d 1039, 1043 (2d Cir. 1990)).  Because the requirements for personal jurisdiction under New York law are more restrictive than those under the federal constitution, satisfaction of the former necessarily entails satisfaction of the latter.  See D.H. Blair, 462 F.3d at 105.

In assessing whether jurisdiction exists over a foreign corporation, courts have traditionally focused on "whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." Wiwa, 226 F.3d at 98.  The continuous presence and substantial activities that satisfy the requirement of doing business, however, "do not necessarily need to be conducted by the foreign corporation itself." Id. at 95. Personal jurisdiction may exist when a foreign corporation "affiliates itself with a New York representative entity and that New York representative renders services on behalf of the

foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." Id.  While the agent "must be primarily employed by the defendant and not engaged in similar services for other clients," the agent need not be involved with "the core" business of the foreign corporation.  Id. at 95-96.  In other words, its work must be "of meaningful importance" to the defendant.  Id. at 96.  The choice of a New York office for an agent may reflect a desire "to establish easy access to New York's rich market of potential customers."  Id. at 97.  A listing on a New York stock exchange in insufficient to confer jurisdiction, but may be considered along with other contacts in determining jurisdiction.  Id.

Sonera asserts in its amended petition that personal jurisdiction exists over Çukurova because (1) it gave contractual consent through its agreement that an award may be enforced wherever a court has "jurisdiction over the award"; and (2) it has engaged in a continuous and systematic course of business in New York.  The commercial contacts on which Sonera relies include Çukurova's negotiations with two New York-based private equity funds regarding the sale of a portion of a television channel; Çukurova's SEC-registered secondary offering

8

of approximately 64 million American Depository Shares ("ADS")
in Turkcell on the New York Stock Exchange, which began in 2006;
Çukurova's sale of 90 million Turkcell shares to an underwriter
for resale to foreign investors, including U.S. investors; U.S.
activities of its subsidiary Turkcell, which Çukurova describes
as its "flagship in the telecommunications sector"; the U.S.
digital pay television services provided by Digiturk, a joint
venture between Çukurova and U.S.-based Providence Equity
Partners; and the location on Park Avenue in Manhattan of two
Çukurova affiliates: Baytur Insaat Taahhüt A.Ş. ("Baytur"),
Çukurova's construction arm, and Equipment and Parts Export Inc.
("EPE"), which facilitates trade between U.S. companies and
Çukurova and describes itself as Çukurova's "gateway to the
Americas."

Sonera has carried its burden of establishing that there is
general jurisdiction over Çukurova in New York.  Although
Çukurova disputes Sonera's characterization of its business
activities in certain respects, the undisputed evidence is clear
that Çukurova and its affiliates are engaged in business
activity in New York that is sufficiently continuous and
systematic as to give rise to general jurisdiction under the
state's long arm statute and the Due Process Clause.

In resisting personal jurisdiction, Çukurova argues chiefly that the U.S.-based activities of Turkcell, Digiturk, EPE, and Baytur cannot be attributed to it, because these entities "do not have the power to bind Çukurova and do not have an agency relationship with Çukurova." As noted above, however, an agency relationship need not be formalized in order to give rise to personal jurisdiction under New York law. Rather, it is enough that the New York-based affiliate "renders services on behalf of the foreign corporation that go beyond mere solicitation and are sufficiently important to the foreign entity that the corporation itself would perform equivalent services if no agent were available." Wiwa, 226 F.3d at 95. That test is unquestionably met here. To take just one example, it is undisputed that EPE was founded by the Çukurova, describes itself as the "gateway to the Americas for Çukurova Group," and devotes a substantial portion of its activities to distributing textiles produced by a Çukurova affiliate that EPE describes as its "sister company." Although Çukurova asserts that it owns only a single, nominal share in EPE, there is no indication in the record that EPE is engaged in business on behalf of interests other than those of Çukurova. Nor does EPE's website identify any clients of the company other than Çukurova, which is itself featured prominently. It thus appears that EPE's

primary function is to give Çukurova "easy access to New York's rich market of potential customers." Id. at 97. Moreover, the record plainly demonstrates that EPE's activities are sufficient to subject it to jurisdiction in New York; Çukurova does not argue otherwise. Thus, there can be no question, in light of the close affiliation just described, that Çukurova is subject to jurisdiction in the state as well.

This conclusion is only reinforced by the other activities identified by Sonera in its petition. Although, Çukurova argues that many of the activities cited by Sonera are by themselves insufficient to support the exercise of personal jurisdiction, taken together they do reflect the continuous use of New York as the forum for Çukurova to conduct its substantial business with the United States. That is all that is required to give rise to personal jurisdiction under New York law and the Due Process Clause.

2. Unenforceability

Çukurova argues that the Final Award should not be enforced on two separate grounds. First, Çukurova contends that the arbitrators exceeded the powers granted by the Agreement, in violation of Article (V)(1)(c) of the Convention, by imposing obligations that fall outside of the Agreement. Second, the panel refused to hear live testimony of Çukurova's only witness

to the parties' negotiations, in violation of Article (V)(1)(b) of the Convention.

First, Çukurova argues that the tribunal exceeded its authority when it awarded damages to Sonera for Çukurova's non-delivery of shares in Turkcell.  Çukurova contends that any damage award could only be ordered pursuant to an arbitration conducted pursuant to the parties' draft share purchase agreement or DSPA and not pursuant to the Agreement.  This dispute was presented to the tribunal, which concluded that it had jurisdiction to decide Sonera's claim for delivery of shares and related damages "even though [it had] been formed under the arbitration clause of the Letter Agreement and the claims for delivery of the Shares arise out of the [D]SPA."

Çukurova's effort to re-litigate the issue of the tribunal's authority under the Agreement is misplaced. "Although the [New York] Convention recognizes that an award may not be enforced where predicated on a subject matter outside the arbitrator's jurisdiction, it does not sanction second-guessing the arbitrator's construction of the parties' agreement." Schneider v. Kingdom of Thailand, 688 F.3d 68, 73 (2d Cir. 2012) (citation omitted).  Cukurova's assertion that the tribunal lacked jurisdiction to award damages is a claim regarding the scope of arbitrability.  Where there is "clear and unmistakable

evidence" of the parties' intent to submit such questions to the arbitrator in the first instance, the district court owes great deference to the tribunal's determination of its own jurisdiction.  Id. at *4-5.  Here there is such evidence, in the form of the parties' agreement to arbitrate pursuant to the rules of the International Chamber of Commerce, which provide, inter alia, that questions of arbitrability should be submitted to the ICA, the arbitral body of the ICC.  See Shaw Group Inc. v. Triplefine Intern. Corp., 322 F.3d 115, 122 (2d Cir. 2003).  Given this deferential posture, there is no error in the tribunal's conclusion that, in committing to arbitrate "[a]ny dispute, controversy or claim arising out of or in connection with [the] Agreement" (emphasis supplied), the parties agreed that an arbitration commenced under the Agreement would be empowered to award damages of the type imposed by the tribunal here.

Next, Çukurova contends that was denied an opportunity to present its case by two separate evidentiary rulings of the tribunal.[1]  Under Article V(1)(b) of the Convention, an exception to enforcement arises where "[t]he party against whom the award

---

[1] Çukurova mentions a third error in a footnote, but the Court will not address it here.  It is well settled, that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."  Tolbert v. Queens Coll., 242 F.3d 58, 75 (2d Cir. 2001).

13

is invoked was not given proper notice of the appointment of the
arbitrator or the arbitration proceedings or was otherwise
unable to present his case."  As interpreted by the Second
Circuit, a party seeking to avoid confirmation of an arbitral
award on the basis of Article V(1)(b) must demonstrate that the
award was rendered pursuant to procedures inconsistent with the
forum state's standards of due process.  Iran Aircraft
Industries v. Avco Corp., 980 F.2d 141, 145 (2d Cir. 1992).
Accordingly, to succeed on this defense, it is not enough for
Çukurova to show that "[i]n handling evidence [the] arbitrator
[did] not follow all the niceties observed by the federal
courts."  Bell Aerospace Co. v. Local 516, 500 F.2d 921, 923 (2d
Cir. 1974).  Rather, Çukurova must establish that it was denied
"an opportunity to be heard at a meaningful time and in a
meaningful manner."  Iran Aircraft, 980 F.2d at 146 (citation
omitted).  Neither of the evidentiary rulings challenged by
Çukurova rises to the level of a due process violation.

    First, Çukurovan complains that the tribunal refused to
permit Mr. Osman Berkmen, an advisor to Cukurov's chairman, to
testify.  The issue over Berkmen's testimony arose as follows.
In November 2005, the tribunal scheduled an evidentiary hearing
for February 1 and 2, 2006.  On January 5, 2006, Çukurova
informed the tribunal that Berkmen could not attend because of a

scheduled surgery.  It submitted a detailed witness statement from Berkmen dated January 11, but did not request an adjournment of the hearing.  At the close of the February 2 hearing, the tribunal requested post-hearing briefs and asked Çukurova to identify "those points of fact on which they consider the testimony of [Berkmen] decisive for their case." The tribunal noted that it would thereafter determine whether "an additional hearing is necessary" for Berkmen's testimony. After considering the post-hearing briefs, the tribunal concluded in writing that "it was not necessary for it to hear" Berkmen in person.

The parties had submitted written witness statements from not only Berkmen but also Sonera CEO Anders Igel regarding a telephone conversation of May 9, 2005 in which they discussed the terms of the DSPA.  Igel testified during the February session, as did Çukurova's Mehmet Karamehmet.  According to Çukurova, if Berkmen had been permitted to testify, he would have explained that he was not familiar with the DSPA and had no authority to bind Çukurova.

In its decision of October 15, 2007, the tribunal wrote that it had assumed that "Berkmen's written testimony was correct and that, when appearing for testimony in person, he would confirm the explanations in his witness statement."  It

also assumed that any personal testimony from Berkmen would
"have confirmed" Çukurova's "factual allegations . . . in this
context."

Çukurova has not shown that the tribunal acted improperly
in refusing to reopen the hearing to permit Berkmen to testify
in person.  Çukurova did not seek an adjournment of the hearing
when it learned that Berkmen would be unavailable.  Çukurova was
permitted to present Berkmen's testimony in written form and the
tribunal accepted it as truthful.  Çukurova has not shown any
violation of its rights or impropriety by the tribunal.

The second alleged error by the tribunal concerns the
calculation of damages.  Çukurova contends that the tribunal
overlooked evidence from its damages expert Christopher Osborne
regarding the illiquidity discount rate.  The tribunal observed
that Sonera's expert Professor Lind

> explained in detail the range that is discussed in the
> literature, in some cases from 13% to 45%.  He has
> explained why he considered the 20% as the proper
> rate.  Mr. Osborne has not provided an alternative
> rate and the Tribunal sees no reason for picking a
> rate different from that proposed by Professor Lind.
> It accepts this percentage.

Osborne had testified on September 13 and 14, 2010, and opined
_inter alia_ that a discount rate of "no more than 10"% was
appropriate.

This complaint by Çukurova fails as well.  The tribunal's decision is best understood as a comment on the quality of the expert opinion testimony given by Osborne rather than any oversight.  The tribunal was fully aware of Osborne's evidence; it referred to him by name.  In its view, however, Osborne failed to provide a persuasive, "detail[ed]" explanation for choosing a rate other than that presented by Lind.

C.  Forum Non Conveniens

Finally, in opposing the petition, Çukurova places particular emphasis on its argument that the doctrine of forum non conveniens requires dismissal.  Within the Second Circuit, the doctrine does apply to proceedings to confirm an arbitration and enforce its award.  See, e.g., Figueiredo v. Republic of Peru, 665 F.3d 384, 389 (2d Cir. 2011).  But see, id. at 396-99 and 396 n.1 (Lynch, J., dissenting).

The framework for analyzing a forum non conveniens motion is well established.  "The decision to dismiss a case on forum non conveniens grounds lies wholly within the broad discretion of the district court," Iragorri v. United Technologies Corporation, 274 F.3d 65, 72-76 (2d Cir. 2001) (en banc), although that discretion is guided by a familiar three-step framework.

17

The district court first determines "the degree of deference properly accorded the plaintiff's choice of forum." Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005).  Although there is "a strong presumption in favor of the plaintiff's choice of forum," Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981), the appropriate degree of deference "moves on a sliding scale" and is correlated with the "degree of convenience" that the choice reflects.  Id. at 154 (citation omitted).  "The more it appears that a . . . plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice."  Id. (citation omitted).  Conversely, the more that a plaintiff's choice of a United States forum appears motivated by forum shopping, the less deference that choice commands.  Id.

At the second step of the forum non conveniens analysis, the district court "considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  Id. at 153.  A forum is generally adequate if the defendant is amenable to service of process there, but it may be inadequate if the remedy it offers "is clearly unsatisfactory," such as where the alternative forum "does not permit litigation of the subject matter in dispute."  Piper, 454

18

U.S. at 254 n.22.  The alternative forum is not inadequate simply because it does not afford plaintiffs the identical causes of action or relief available in the plaintiffs' chosen forum.  Norex, 416 F.3d at 158.

Finally, at step three, the court "balances the private and public interests implicated in the choice of forum."  Id. at 153.  Even if the plaintiff's choice of forum is entitled to little difference and there is an adequate alternative forum, dismissal is not appropriate unless the court concludes that the balance of public and private interest factors "tilts strongly in favor" of the alternative forum.  PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir. 1998).  Private interest factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Iragorri, 274 F.3d at 73-74 (citation omitted).  Among public interest factors, the court may consider: the administrative inefficiency in trying a case in a busy court and away from the locus of the injury; the burden that jury duty may impose on the community if the case is tried in a venue with no connection to the issues in dispute; a community's interest in having a local

case decided at home; and the benefits to having a matter tried in the forum whose law will govern the case.  Id. at 74.

Çukurova has not shown that this Court should exercise its discretion to dismiss this petition through application of the doctrine of forum non conveniens.  Most of its arguments have little force or are inapposite to a proceeding to confirm an arbitration award.

As recently noted by the Honorable Gerard E. Lynch in his dissent, "because arbitrators have no power to enforce their judgments, international arbitration is viable only if the awards issued by arbitrators can be easily reduced to judgment in one country or another and thereby enforced against the assets of the losing party."  Figueiredo, 665 F.3d at 395.  To strengthen international commerce and, indeed, to enable businesses to enter into international commercial agreements, the drafters of the New York Convention crafted a "document that would carefully circumscribe the bases on which the courts of a signatory nation could disregard an arbitration provision or refuse to enforce an arbitral award."  Id. at 396.  Given this backdrop, before dismissing a petition based on a forum non conveniens argument, a court should be alert to the context in which such an application is made.  Arguments that may have some weight or even considerable weight in the context of a lawsuit

in which the merits of a claim will be decided may have limited appeal when the context is the enforcement of an arbitration award governed by the New York Convention.

As concerns the first step of the forum non conveniens analysis, Sonera's choice of forum is undoubtedly entitled to deference.  Sonera seeks to enforce the Final Award against any Çukurova assets that may be found in the United States.  This is an entirely legitimate purpose.  The New York Convention and the FAA sanction the use of this forum for that very purpose.

In opposing confirmation, Çukurova notes that Sonera has identified no assets in the United States against which it might seek to enforce the Final Award, that both parties to the arbitration are non-U.S. entities, and that there is no relevant evidence in this country.  Çukurova therefore concludes that in seeking confirmation here, Sonera hopes to gain access to the broad discovery rights generally available in American courts.

But the fact that it has not identified U.S. assets belonging to Çukurova does not establish that Sonera lacks a good-faith basis for seeking enforcement here.  Çukurova may acquire property in the United States in the future; if that occurs, "having a judgment in hand," as opposed to merely an arbitral award, "will expedite the process of attachment."  TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d 296, 303

(D.C. Cir. 2005).  Nor are the nationalities of the parties of much relevance in the particular context of a proceeding to confirm an arbitral award.  As already discussed, the New York Convention and the FAA were both intended to encourage international commerce and to make an American forum as hospitable to enforcement of foreign arbitral awards as we hope foreign venues will be to enforcement proceedings begun by American businesses.  Consequently, it would be contrary to American law to find that the motives of Sonera can be impugned when it seeks to enforce an international arbitral award simply because it is a foreign company.  Çukurova's third argument in this regard -- that the absence of evidence in the United States suggests impermissible motives on the part of the petitioner -- is likewise unconvincing.  Because this is an application to confirm an arbitration award, the absence of witnesses and documents concerning the merits of the parties' claims is irrelevant.  Similarly, a confirmation proceeding is intended to be a summary proceeding, making access to American discovery rules unnecessary.  Neither of these reasons, therefore, suggests that Sonera's choice of forum is entitled to reduced deference.

The second step of the analysis does not weigh significantly in favor of or against dismissal.  The parties

22

agree that there are multiple alternative fora in which enforcement proceedings could proceed.  These include each of the countries in which Sonera has already commenced enforcement proceedings and Turkey.  But the parties also agree that enforcement proceedings may properly be brought concurrently in multiple venues.

The relevant question is thus whether the balance of private and public interest factors "tilts [so] strongly in favor" of dismissal as to overcome the presumption in favor of the plaintiff's choice of forum.  See PT United Can Co., 138 F.3d at 74.  The private interests that should be considered in connection with the forum non conveniens doctrine do not suggest that this petition should be dismissed.  In this summary proceeding, the parties may present their arguments for and against confirmation on paper without resort to either discovery or the presentation of evidence in open court.  Again, in its discussion of the private interests that are at stake, Çukurova ignores the nature of a confirmation proceeding.  It argues that such private interests as the existence of "potential witnesses and evidence . . . some 5,000 miles away" make litigation in New York inconvenient.  While the location of witnesses and evidence would be relevant to the conduct of a trial on the merits, it is not germane to a confirmation proceeding.

The public interest factors likewise point in favor of this forum.  This proceeding will have no impact on issues of court congestion.  There is no need for a jury trial or any other imposition on the citizenry of New York.  It is unnecessary for this Court to apply foreign law in adjudicating this confirmation petition.  Finally, there are strong national and local interests in allowing this confirmation proceeding to go forward in this jurisdiction.  The United States undoubtedly has a strong interest in satisfying its treaty obligations by permitting confirmation and enforcement of foreign arbitral awards "in the vast majority of cases." Figueiredo, 556 F.3d at 394 (Lynch, J., dissenting).  And New York has a particular interest in convincing the international business community of the benefits of selecting New York law and a New York forum in order to ensure fairness and predictability in their commercial relationships.  Indeed, the Honorable Judith Kaye, formerly Chief Judge of the State of New York, recently spearheaded a task force under the auspices of the New York State Bar Association whose mission was precisely that.  See Final Report of the New York State Bar Association's Task Force on New York Law in International Matters (June 25, 2011), available at http://www.nysba.org/AM/Template.cfm?Section=Home&Template=/CM/C ontentDisplay.cfm&ContentFileID=53613.

In its discussion of the public interest factors, Çukurova largely relies on Turkey's significant interest in a dispute regarding a major Turkish telecommunications provider and the existence of Çukurova assets in Turkey.  While it is undeniable that Turkey has a strong interest in this dispute, it is noteworthy that Çukurova executed an agreement that provided for international arbitration in Switzerland with no appeal rights. That agreement further provided that enforcement of the arbitration award could proceed "in any court having jurisdiction over the award . . . .  Applications may be made to such court for judicial recognition of the award and/or an order for enforcement, as the case may be."  This Court has jurisdiction over the Final Award, and Çukurova does not suggest otherwise.  Çukurova having executed an agreement that provided for foreign arbitration and foreign enforcement of any arbitral award, it is difficult to find that Turkey's interest in its telecommunications industry should trump any of the other public policy interests that support foreign enforcement of foreign arbitral awards.

CONCLUSION

Sonera's December 6, 2011 petition to confirm the Final Award is granted.  Sonera shall submit a proposed judgment no later than September 17, 2012.


SO ORDERED:

Dated:     New York, New York
           September 10, 2012


                              _____
                              DENISE COTE
                         United States District Judge

26