UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SONERA HOLDING B.V.,

　　　　　　　　　Petitioner,

　　　　v.

ÇUKUROVA HOLDING A.Ş.,

　　　　　　　　　Respondent.

Case No. 11 CIV 8909 (DLC)
ECF Case

**ÇUKUROVA HOLDING A.Ş.'S MEMORANDUM OF LAW IN OPPOSITION TO
PETITIONER'S MOTION FOR INCREASED CONTEMPT FINES, TURNOVER
ORDER, PRELIMINARY INJUNCTION, AND EX PARTE TEMPORARY
RESTRAINING ORDER**

David M. Lindsey
Andreas A. Frischknecht
Jennifer L. Gorskie

**CHAFFETZ LINDSEY LLP**
505 Fifth Avenue, 4th Floor
New York, NY 10017
Tel. (212) 257-6960
Fax (212) 257-6950
www.chaffetzlindsey.com

*Attorneys for Çukurova Holding A.Ş.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ...................................................................................................... 5

    I.     The BVI Proceedings and the "Redemption Transaction" ...................... 5

    I.     Sonera's Attempt to Enjoin the Redemption Transaction in the BVI ................... 7

    II.    Sonera's Request for Injunctive Relief from this Court ........................... 8

ARGUMENT ............................................................................................................ 9

    I.     Sonera's Request for a Preliminary Injunction Is Improper and
          Must Be Denied ...................................................................................... 9

         A.    The Court Should Give Deference to the Judgment of the BVI
               Court, Which Has Already Denied Sonera's Injunction ........................... 9

         B.    The Requested Injunction Is Improper and Does Not Serve Any
               Legitimate Interest of Sonera or this Court ................................. 13

         C.    Sonera's Unwillingness to Provide Security Pursuant to Fed. R.
               Civ. P. 65(c) Precludes Any Injunctive Relief ......................... 14

    II.    Sonera's Claims For Injunctive Relief Against and Turnover of Assets
          Belonging to Third Parties That are Not Before This Court are Improper
          and Must be Denied .............................................................................. 16

         A.    Controlling Second Circuit Precedent Bars Sonera From Litigating
               its Veil-Piercing Claims Against Mehmet Karamehmet and
               Various Çukurova Holding "Affiliates" in This Proceeding ................... 16

         B.    No Factual Basis Exists for Sonera's Veil-Piercing Claims ..................... 19

    III.    Sonera's Request for Increased Fines Is Improper and Baseless ........................... 23

CONCLUSION ....................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
   98 F.3d 13 (2d Cir. 1996)...……....................................................……18

*C.G. Holdings, Inc. v. Rum Jungle, Inc.*,
   582 F. Supp. 2d 385 (E.D.N.Y. 2008)...………....................................……18

*Diorinou v. Mezitis*,
   237 F.3d 133 (2d Cir. 2001)….....…...................…….............................8-9

*Doctor's Assocs., Inc. v. Distajo*,
   107 F.3d 126 (2d Cir. 1997)…....…...................…….......................……14

*Epperson v. Entm't Express, Inc.*,
   242 F.3d 100 (2d Cir. 2001)...……....................................……..........……18

*Fletcher v. Atex, Inc.*,
   68 F.3d 1451 (2d Cir. 1995)...……..................................................……18

*Glencore AG v. Bharat Aluminum Co.*,
   No. 10 Civ. 5251(SAS), 2010 WL 4323264
   (S.D.N.Y. Nov. 1, 2010)…....…...…....................................……..........……16

*Imagineering, Inc. v. Lukingbeal*,
   No. 94 Civ. 2589 (RLC), 1997 WL 363591
   (S.D.N.Y. June 30, 1997)…....….......................................……….......……17

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   295 F. Supp. 2d 366 (S.D.N.Y. 2003)…...….......................………..........……17

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004)…...….......................................………......…...17

*Motorola Credit Corp. v. Uzan*,
   739 F. Supp. 2d 636 (S.D.N.Y 2010)...………....................................……17, 20

*NYKCool A.B. v. Pac. Fruit Inc.*,
   No. 10 Civ. 3867(LAK)(AJP), 2012 WL 1255019
   (S.D.N.Y. Apr. 16, 2012)…....….......................................……….......…...16

*Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama*,
   312 F.2d 299 (2d Cir. 1963)…....….......................................……….......…...16

*Peacock v. Thomas*,
   516 U.S. 349 (1996)...………....................................................……18

*TNS Holdings, Inc. v. MKI Sec. Corp.*,
    92 N.Y.2d 335 (1998)...………….................................................................…19

*United States v. Funds Held in the Name or for the Benefit of Wetterer*,
    210 F.3d 96, (2d Cir. 2000)...……......................................................……18

*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*,
    825 F.2d 709 (2d Cir. 1987)...……......…….....…..…..............................8

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
    933 F.2d 131 (2d Cir. 1991)...…….....……….......................................…17

## S<small>TATUTES</small>

28 U.S.C. § 1332 …………..……..…..……………………....…………......….............17

CPLR 5225(b) …………..……..…..……………………....……………..…..............15

Fed. R. Civ. P. 65(c) …………..……..…..……………………....……………....……14

Respondent Çukurova Holding A.Ş. ("Çukurova Holding") hereby opposes the Motion of Petitioner Sonera Holding B.V. ("Sonera") for Increased Contempt Fines, Turnover Order, Preliminary Injunction and *Ex Parte* Temporary Restraining Order (the "Motion").

## PRELIMINARY STATEMENT

The injunctive relief Sonera seeks directly contradicts a recent decision of the Commercial Court of the British Virgin Islands ("BVI Court"), which denied Sonera's application for similar injunctive relief – a fact that Sonera fails to disclose to this Court in the Motion.[1]   It will also render nugatory a recent decision of the Privy Council of the United Kingdom, which was the culmination of six years of hard-fought litigation.   Sonera applies to this Court on an "urgent" basis solely in order to obtain from this Court what it could not obtain in the BVI.   But as the BVI Court already held, the relief that Sonera improperly seeks serves *no legitimate interest of Sonera* – yet it will have irreparable and devastating consequences for Çukurova Holding.   Sonera's request is improper and must be denied.

---

[1]   Sonera surely made no mention of the BVI Court's adverse ruling when it appeared before Part I Judge Sweet, who signed the April 8, 2013 Order to Show Cause based on the representations of the only party before him.   Çukurova Holding assumes that this matter was heard by the Part I judge in Your Honor's absence this past week, and Sonera made the most of the opportunity by obtaining at least two *ex parte* orders – with Çukurova Holding prohibited from even seeing the second *ex parte* order.   The second, "secret" order signed by the Part I judge was no doubt drafted by Sonera and apparently provides that Çukurova Holding and its legal counsel are barred from seeing documents filed under seal in this matter.   Çukurova Holding only learned of this second, "secret" order when Sonera filed additional documents with the Court, under seal, during the late afternoon of April 11.   When Çukurova Holding sought copies, Sonera refused, citing the "secret" order that Çukurova Holding was not allowed to see and saying only that the sealed documents filed that day were not related to the matters to be heard on April 16.   Çukurova Holding has no idea if the secret order itself relates to the April 16 hearing.   In any event, Çukurova Holding respectfully requests that this Court order that all decisions signed by the Part I judge and all documents filed under seal in this matter be released to Çukurova Holding.   With the Court's permission, Çukurova Holding will raise this matter at the April 16 hearing.

In the month since the parties were last before this Court, the only "new" event that has occurred is that Sonera applied for – but was denied – injunctive relief in the BVI. There is no urgent basis and no legitimate purpose for the relief Sonera seeks, *other than* to overturn the effect of the BVI judgment. This is clear from the very face of Sonera's Motion. First, without providing any reason or basis, Sonera seeks to exponentially increase the contempt fines only recently imposed on Çukurova Holding by this Court. Second, Sonera seeks to restrain and turnover hundreds of millions of dollars in assets held by an amorphous and undefined group of entities and persons that are <u>not</u> parties to this proceeding and that have never been found to be alter egos of Çukurova Holding. As Sonera well knows, basic principles of due process and New York law require Sonera to commence and notice *a separate action*, and establish an independent basis for subject matter jurisdiction, in order to pursue assets of third parties it contends are Çukurova Holding's alter egos. Moreover, Sonera has alleged the existence of these potential alter egos, and the risk of transfer to such alter egos, since the very start of these enforcement proceedings, and it has submitted <u>no new evidence about such alter egos or transfers</u> with its injunction request. It is difficult to understand, then, how there is any sudden "urgent" basis for an injunction against these alleged alter egos. Sonera's attempt to adjudicate sanctions, alter ego, and turnover through the mechanism of an expedited proceeding for a preliminary injunction is procedurally improper, and its request for relief to which it is not entitled must be denied.

Contrary to Sonera's representations, its request for injunctive relief in fact has nothing to do with satisfying Sonera's judgment. Sonera's *true* goal in requesting extraordinarily far-reaching injunctive relief from this Court is to prevent Çukurova Holding and its BVI affiliate Çukurova Finance International Limited ("CFI," together the "Çukurova Parties") from raising

financing that will enable CFI to repay its loan to Alfa Telecom Turkey Limited ("Alfa") and, thereby, to redeem its indirect controlling interest in Turkcell, Turkey's largest mobile network operator (and will further allow Çukurova Holding to redeem its interest in CFI) (the "Turkcell Shares").  This Court will recall that Sonera's counsel in these enforcement proceedings, Hogan Lovells, is directed by the Alfa parties, and that the Çukurova Parties and Alfa have been engaged in contentious litigation proceedings for the last six years in the BVI concerning the ownership of the Turkcell Shares (the "Alfa Proceedings").  On January 30, 2013, the Privy Council ruled against Alfa and held that the Çukurova Parties are entitled to redeem the Turkcell Shares from Alfa, upon payment to Alfa of an amount to be determined by that court, but in the range of US $1.5 to $3 billion (the "Redemption Transaction").  If the Çukurova Parties cannot pay this sum, Alfa will retain the Turkcell Shares.  The Çukurova Parties do not have such funds but must raise the necessary financing in the marketplace.  Accordingly, Alfa's last remaining hope to wrest control of Turkcell from the Çukurova Parties is to prevent them from raising that financing so that Alfa is confirmed as the owner of those Turkcell Shares.  The stakes for Alfa could not be higher: unless it can somehow prevent the Çukurova Parties from obtaining the financing necessary to redeem the Turkcell Shares, Alfa's six-year struggle to wrest control of Turkcell will have failed.

Only two weeks ago, Alfa's joint venture partner Sonera[2] failed in its attempt to obtain an injunction from the BVI Court, which would have had the effect of preventing the Redemption

---

[2] The Alfa Parties and Sonera are parties to a Joint Venture Agreement that authorizes the Alfa Parties to "pursue to the fullest extent possible" any and all steps to enforce Sonera's arbitration award against Çukurova Holding's assets worldwide, in return for payment of US$100 million to Sonera as an "Award Fee."  *See* Declaration of John Reynolds, dated April 12, 2013 ("Reynolds Decl."), Ex. 17 – JVA, Sch. 5, Clauses 4(b) and 8.  Pursuant to the JVA, Hogan Lovells is acting as counsel for the Alfa Parties in relation to the worldwide enforcement of the Final Award, and proceeds recovered by Hogan Lovells are to be shared

Transaction.  In a decision rendered on March 27, 2013, the BVI Court denied the injunction on various grounds, including its finding that the requested injunction served *no legitimate purpose of Sonera*.  *See* Reynolds Decl. Ex. 11 – Note of Judgment, Bannister J., March 27, 2013, at 1. Undeterred, Sonera now seeks from this Court an injunction that would have precisely the same commercial effect – ensuring Alfa's control of Turkcell – as the injunction the BVI Court declined to grant.  Specifically, the injunction Sonera seeks would bar Çukurova Holding and/or its "affiliates" from exercising its "Redemption Right"[3] in the Alfa Proceedings, would freeze the funds of any hypothetical financing, and would prohibit not only Çukurova Holding, but "affiliates" of Çukurova Holding, its chairman Mehmet Karamehmet, and "anyone acting in concert with them" from engaging in the Redemption Transaction by pledging assets that would enable Çukurova Holding to raise the necessary financing.  It will be impossible for Çukurova Holding to raise the financing it needs or to redeem the Turkcell Shares if the injunction is

---

between the Alfa Parties and Sonera.  *See id.* Sch. 5, Clause 10 & Power of Attorney.  In its March 22, 2013 Skeleton Argument submitted to the BVI Court, Sonera stated for the first time that the JVA expired in August 2012, but that the parties had entered into a Variation Agreement which continued certain of its provisions on April 24, 2012.  *See* Reynolds Decl. Ex. 10; Ex. 7 ¶¶ 18, 59.3.  The BVI Court expressed skepticism about the accuracy of this statement.  *See* Reynolds Decl. Ex. 12 at 30-31.  In any event, the JVA itself provides that key parts of it survive its termination - including the key parts of Schedule 5 dealing with the rights of the Alfa Parties to enforce Sonera's arbitration award and the sharing of the proceeds of enforcement. *See* Reynolds Decl. Ex. 17, Clause 12, and Sch. 5, Clauses 4, 8-10 and 14. Moreover, Sonera's counsel appeared to indicate that an agreement continues to exist between Alfa and Sonera regarding the management of Turkcell and Turkcell Holding, stating that the "joint venture simply deals with situation in the event that either Sonera or Alfa ultimately get the shares and deals the way of managing Turkcell and Turkcell Holding going forward if that occurs… It's an agreement to cooperate in the management of Turkcell going forward." *See* Reynolds Decl. Ex. 5 at 38:5-12.  Finally, as recently as December 2012 in connection with discussions before this Court regarding the entry of a protective order, Hogan Lovells confirmed that Alfa continued to direct its conduct in these proceedings. *See* Declaration of Jennifer L. Gorskie, dated April 12, 2013 (the "Gorskie Decl."), Ex. 1 – Tr. Dec. 19, 2012 PM Conference at 5:13-21.

[3]  For the avoidance of doubt, Çukurova Holding does not accept Sonera's definition of the term "Redemption Right."  *See* Sonera Br. at 2.

issued.  As a consequence, there will be no redemption, and Alfa will keep the shares.  In effect, six years of litigation in the BVI will end up being decided by an injunction of this Court sitting in New York in an expedited proceeding and without the benefit of a full record.

The request by Sonera is in fact paradoxical and self-defeating in the sense that, if the injunction is issued, Çukurova Holding will not be able to raise the money it needs to redeem the Turkcell Shares, which are worth nearly $2 billion, and thus the injunction will ultimately *deplete* the assets potentially available to satisfy Sonera's judgment.  Accordingly, as the BVI Court already found, the injunction serves no legitimate interest of Sonera.  It is sought solely to satisfy *Alfa's* goal of preventing the Çukurova Parties from redeeming the Turkcell Shares.

Because Sonera's request concerns matters at the very heart of the BVI proceeding, the only appropriate forum to adjudicate the request is in the BVI Proceedings.  This Court should defer to the decision of the BVI Court, which is intimately familiar with these parties and their underlying dispute, and refuse to grant Sonera relief that was not granted in the BVI.

## BACKGROUND

### I.      The BVI Proceedings and the "Redemption Transaction"

For six years, Çukurova Holding and one of its subsidiaries, CFI, has been involved in acrimonious litigation against Alfa in courts of the BVI.[4]  The Alfa Proceedings concern shares in an entity called Çukurova Telecom Holding Limited ("CTH"), which shares confer indirect control over Turkcell.  CFI owns 51% of the shares in CTH, and CFI was, in 2005, wholly owned by Çukurova Holding.  Reynolds Decl. ¶ 5.  In 2005, CFI pledged its shares in CTH, as collateral for a loan to CFI from Alfa, and Çukurova Holding pledged its shares in CFI as security for the obligations which it assumed in relation to the loan.  *Id.*  Alfa eventually claimed

---

[4]          BVI law is, in most material respects, the same as English law.

to have appropriated (i.e., forfeiture) of these shares, and litigation ensued in the BVI, one of the fora selected by Alfa and the Çukurova Parties in their loan agreement.  *Id.*

After a three-week trial in BVI and an appeal to the Court of Appeal in the Eastern Caribbean, the validity of Alfa's appropriation was the subject of a four-day hearing before the Judicial Committee of the Privy Council in October 2012.  Reynolds Decl. ¶¶ 6-7.  The Privy Council is the highest court of appeal for the UK overseas territories and Crown dependencies, and for those Commonwealth countries that have retained the right to appeal to Her Majesty in Council.  Reynolds Decl. ¶ 6.  The Justices of the Privy Council also sit as Justices of the UK's Supreme Court.  The Privy Council handed down its judgment on January 30, 2013, holding that the Çukurova Parties should be granted relief from forfeiture of the Turkcell Shares.  Reynolds Decl. ¶ 7; *id.* Ex. 1.  The result of this ruling is that the Çukurova Parties will be given the opportunity to recover the Turkcell Shares upon payment to Alfa of a sum still to be determined (as earlier defined, the "Redemption Transaction").  Reynolds Decl. ¶ 7; *id.* Ex. 1.  The Privy Council's ruling determining the sum to be paid is expected imminently; the sum is likely to be between US$1.5 billion and US$3 billion.

Çukurova Holding does not have the resources to make such a payment and will have to borrow substantial sums in order to do so.  Çukurova Holding is already in discussions with a syndicate of banks to obtain the necessary financing.  As would be expected in any asset financing transaction of this scale, those banks have indicated that they will require a first-ranking pledge over the Turkcell Shares as security for their loan. Reynolds Decl. Ex. 2 – Karamehmet Aff. ¶¶ 41-43, 47.  Unless a first-ranking pledge over the Turkcell Shares can be provided to potential lenders, the Redemption Transaction will not take place.  *Id.* ¶ 49.  Nor does Çukurova Holding have sufficient other assets to provide as collateral for financing of the

required magnitude.  *See* Reynolds Decl. Ex. 11 – Note of Judgment at 2, 4; *see also id.* Ex. 2 –

Karamehmet Aff. ¶¶ 50-83.  And, if the Çukurova Parties cannot obtain the necessary financing,

they will be unable to recover the Turkcell Shares from Alfa, in which case Alfa will achieve its

true, long-time goal of gaining control of Turkcell.

I.      **Sonera's Attempt to Enjoin the Redemption Transaction in the BVI**

Sonera holds a judgment in the BVI confirming the very same Final Award that was

before this Court, and is pursuing enforcement there (the "BVI Enforcement Proceedings").  On

February 19, 2013, Sonera applied to the BVI Court seeking to enjoin Çukurova Holding from

pledging the Turkcell Shares as security to potential lenders in connection with the Redemption

Transaction.  Reynolds Decl. ¶ 12.  Sonera argued that it should be entitled to apply for a

charging order over the shares, and in the alternative, that Çukurova Holding should be enjoined

from pledging the shares to any third party.  Reynolds Decl. ¶ 12; *id.* Ex. 3 – Sonera Notice of

Application.

The BVI Court denied Sonera's request for an injunction and charging order (the "BVI

Decision").  Reynolds Decl. ¶ 15; *id.* Ex. 11 – Note of Judgment.  The BVI Court rejected

Sonera's argument that, by virtue of its status as a judgment creditor, Sonera was entitled to

interfere with the Redemption Transaction.  Reynolds Decl. Ex. 11 – Note of Judgment at 2.

Indeed, the court appeared to accept the argument made by counsel for Çukurova Holding that

the injunction sought by Sonera was actually *not* in Sonera's legitimate interests.  It is

established in the enforcement proceedings brought by Sonera in the BVI, just as it is in this

Court, that Çukurova Holding has no assets in that jurisdiction.  But if Çukurova Holding is able

to redeem the Turkcell Shares (which are worth about $2 billion), it will possess a very valuable

asset potentially available to Sonera for the purposes of enforcing its judgment.[5]  If Sonera's injunction in the BVI had been successful, on the other hand, then, as the BVI Court found, Çukurova Holding would not be able to redeem the Shares.  Accordingly, as the BVI Court acknowledged, the injunction sought by Sonera in the BVI was neither in Sonera's interest *nor* Çukurova Holding's interest.

Sonera is currently appealing the BVI Decision to the Eastern Caribbean Court of Appeal.  It is expected that a hearing of that appeal will be scheduled for a date in early May.  Reynolds Decl. ¶ 17.

## II.    Sonera's Request for Injunctive Relief from this Court

On April 8, 2013, while its appeal of the BVI Decision was still pending, Sonera appeared *ex parte* before Part I Judge Sweet and obtained an Order to Show Cause and a Temporary Restraining Order ("TRO") restraining "Çukurova [Holding] and Çukurova [Holding]'s affiliates (including their officers, agents, servants, employees, and attorneys), Mr. Karamehmet and any person acting in concert with, or on behalf of, the foregoing entities and Mr. Karamehmet (including any financial institutions) . . . from selling, transferring, assigning, hypothecating or pledging any of the funds and/or property that are the subject of Sonera's motion for a turnover order . . . ."  The Order also relieves Sonera of posting any security in connection with the TRO or preliminary injunction.  Order to Show Cause (Dkt. # 82).

The effect of the TRO, and of the preliminary injunction Sonera seeks, is identical to that sought in the BVI Proceedings: to prevent Çukurova Holding from financing the Redemption Transaction.  The injunction seeks to enjoin Çukurova Holding from transferring or pledging (1)

---

[5]    Çukurova Holding's Chairman Mr. Karamehmet testified that Çukurova Holding has no intention to dispose of the Shares or its right to redeem the Shares.  Reynolds Decl. Ex. 2 – Karamehmet Aff. ¶ 121.

any assets held by Çukurova Holding, by Mr. Karamehmet, and/or by certain other purported "Affiliates" of Çukurova Holding; (2) the "assets of CFI and CTH," (3) any financing Çukurova Holding is able to raise in connection with the Redemption Transaction, and (4) from exercising the "Redemption Right" itself.  Sonera Br. at 16-17.  If the injunction is granted, no lenders will be willing to participate in the financing.  Further, the injunction specifically precludes financial institutions from working with Çukurova Holding to pledge any shares or transfer any funds in connection with the Redemption Transaction.  *Id.*  Finally, the injunction seeks directly to prohibit Çukurova Holding from exercising the "Redemption Right.  *Id.*  Accordingly, the relief sought by Sonera has the same effect as that in the BVI:  with the injunction in place, the Redemption Transaction will not go forward, and the Turkcell Shares will be lost to Alfa forever.

For this reason, Sonera's request that this Court also "freeze" any proceeds from the Redemption Transaction in order to satisfy Sonera's judgment is highly misleading.  The Redemption Transaction will never take place if the Court issues the injunction Sonera seeks.  Accordingly, as was the case in the BVI, the injunction cannot and will not serve the purpose Sonera claims: to provide assets to satisfy the judgment of Sonera.  The injunction is therefore not in Sonera's interest at all.  The only interest served by the injunction belongs to Alfa, which wishes to prevent redemption and retain the Turkcell Shares.

## ARGUMENT

I.    **Sonera's Request for a Preliminary Injunction Is Improper and Must Be Denied**

A.    The Court Should Give Deference to the Judgment of the BVI Court, Which Has Already Denied Sonera's Injunction

Sonera's Motion seeks injunctive relief that will have the same commercial effect as the injunctive relief Sonera unsuccessfully sought in the BVI:  that is, it will prevent Çukurova Holding from raising financing to complete the Redemption Transaction.  The BVI Court has

already considered and denied Sonera's request for such injunctive relief.  This Court should extend comity to the BVI Decision and deny Sonera's request for an injunction.

"Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) (citing *Hilton v. Guyot,* 159 U.S. 113, 202-03 (1895)).  While federal courts are not obliged to recognize judgments rendered by the courts of a foreign state, they may choose to give res judicata effect to foreign judgments on the basis of comity.  *Diorinou v. Mezitis*, 237 F.3d 133, 139-40 (2d Cir. 2001).

The Court should extend comity to the BVI Decision.  Justice Bannister QC, the trial judge for the BVI Commercial Court, is a respected judge who presides over the Commercial Court of the Eastern Caribbean and has been deeply steeped in the adjudication of *both* the Alfa Proceedings *and* the BVI Enforcement Proceedings since late 2009.  Reynolds Decl. ¶ 10.  The issues underlying the Alfa Proceedings and the BVI Enforcement Proceedings are deeply intertwined.  Justice Bannister has carefully labored over these issues, writing more than 100 pages of written decisions on the respective rights and obligations of the parties.  Justice Bannister has also considered both live and written testimony from Çukurova Holding's chairman, Mehmet Karamehmet, and several other witnesses put forth by Alfa, Sonera and Çukurova Holding.[6]  *Id.* ¶ 11.  He has also considered and had the benefit of judgments issued by two higher courts – the Eastern Caribbean Court of Appeal and the Privy Council – on many of these same issues.  Reynolds Decl. ¶¶ 6-7.

---

[6]   On several occasions, Justice Bannister has found Mr. Karamehmet to be a credible witness.  Most recently at the March 27 injunction hearing, the Justice stated "Having watched [Karamehmet] give evidence I am not disposed to disbelieve him on paper just because someone says so."  Reynolds Decl. Ex. 12 – Note of Hearing at 26.

In connection with Sonera's recent injunction application, the BVI Court held a live hearing in which Justice Bannister considered four affidavits submitted by both parties and nearly 900 pages of evidence and skeleton arguments. Reynolds Decl. ¶¶ 14-15. On this full and complete record, and with the benefit of his intimate knowledge and understanding of these parties and facts, he issued the BVI Decision denying Sonera's requested injunction. Reynolds Decl. Ex. 11 – Note of Judgment.

In the BVI Decision, the BVI Court began by considering the procedural posture of the case, which is nearly identical to that here: (1) Sonera's arbitration award has been made enforceable in the BVI as a judgment; (2) the BVI Court previously rejected Çukurova Holding's request to set aside the arbitral award; (3) Çukurova Holding has appealed the BVI Court's confirmation of the arbitral award to the Eastern Caribbean Court of Appeal, which appeal is currently still pending; and (4) there is no stay in place and the judgment is presently in force. Reynolds Decl. Ex. 11 – Note of Judgment at 1.

The BVI Court then went on to consider Sonera's argument that, as a judgment creditor, it should have recourse to the Turkcell Shares once acquired by Çukurova Holding "in an unencumbered state" in order to satisfy its judgment, and that Çukurova Holding therefore should be enjoined from pledging the Shares to potential lenders. The BVI Court disagreed. It held:

> It seems to me that I have no right, I use that word deliberately rather than jurisdiction, no right to stop an enterprise from charging acquiring assets to fund an acquisition . . . .

Reynolds Decl. Ex. 11 – Note of Judgment at 1.

Importantly, the BVI Court also held that the Redemption Transaction would not take place if the injunction was issued, and that the relief sought by Sonera would *decrease*, rather

than *increase*, the assets potentially available to Sonera for enforcement.  The court found that "it is clear that Çukurova will not be able to reacquire the shares without using them as security." Reynolds Decl. Ex. 11 – Note of Judgment at 2.

The BVI Court's reasoning applies equally to Sonera's current request for injunctive relief, and the BVI Decision should be afforded judicial deference.  Sonera may try to argue that it seeks *different* relief in these proceedings in that in the BVI, it sought to enjoin Çukurova Holding from pledging the Shares *prior* to receiving financing, whereas here, it seeks to enjoin Çukurova Holding from transferring or using any financing it may raise in order to effect the Redemption Transaction.  But this argument fails.  As already found by the BVI Court, potential lenders will have no interest in extending financing to Çukurova Holding if they are not given an adequate collateral package, including a first-ranking pledge over the Turkcell Shares to secure the loan.  Thus, were this Court to issue an injunction preventing Çukurova Holding from ultimately redeeming the Turkcell Shares by preventing Çukurova Holding from pledging assets, including the Turkcell Shares, to finance the redemption, or by enjoining the exercise of the "Redemption Right" altogether, Çukurova Holding would never be able to raise the financing it needs.  The BVI Court has already rejected this result.

This Court has already indicated that it has no intention of becoming embroiled in litigation that is properly before the courts of the BVI.  At the March 8 sanctions hearing, the Court held:

> We're down to the litigation being conducted in the BVI.  That is a proceeding before a court there.  If there is any necessity for any of the parties before that court to be protected, they have an opportunity to make application there.

Gorskie Decl. Ex. 2 – Mar. 8 Hr'g Tr. 15:8-12.  The Court further stated that, as of the March 8 hearing, "I have no record upon which I can find that enforcement proceedings for this judgment,

including discovery, would be unreasonably used to interfere with the BVI litigation." *Id.* 15:12-15. Sonera has now put such a record squarely before this Court. It asks this Court not only to directly interfere with the BVI Decision, but also to interfere with and essentially render nugatory the decision of the Privy Council after six years of litigation that Çukurova Holding is entitled to redeem the Turkcell Shares. Moreover, Sonera has already appealed the BVI Decision to the Court of Appeal. The Court should reject Sonera's application and afford comity to the BVI Decision by staying its hand and refusing to grant the injunction Sonera seeks.

### B.    The Requested Injunction Is Improper and Does Not Serve Any Legitimate Interest of Sonera or this Court

Sonera's request for injunctive relief is improper because it does not serve any legitimate interest of Sonera, or of this Court, in enforcing Sonera's judgment. As was the case in the BVI, the injunction Sonera seeks can only have the result of *preventing* the financing from ever taking place. Accordingly, there is no set of circumstances in which preventing Çukurova Holding from redeeming the Turkcell Shares can <u>ever</u> result in the turnover of funds potentially available to satisfy Sonera's judgment. In reality, the proposed injunction can only *deplete* the assets potentially available to satisfy the judgment. The Turkcell Shares are by far the most valuable asset potentially available to Sonera for enforcement. Although Çukurova Holding must grant a first-ranking pledge over those Shares in order to obtain financing, Sonera will then be able to pursue enforcement of its judgment against those Shares. If Çukurova Holding cannot complete the Redemption Transaction, the Turkcell Shares will be confirmed as Alfa's and will never be available for potential enforcement by Sonera. Accordingly, there is no irreparable harm to Sonera if the Court does not grant the requested injunction. The only irreparable harm would flow to Çukurova Holding if it *does* grant the injunction.

This Court should seriously question whether Sonera is truly interested in enforcement of its judgment, or is acting on behalf of *other* interests.  For example, while Sonera suggests that without the injunction, its judgment may be rendered "uncollectible," it has <u>never seriously engaged in enforcement efforts in this Court</u>.  It has not properly pursued turnover or filed any proceedings against potential alter egos.  Perhaps even more significantly, it has never pursued enforcement of the Final Award in Turkey, <u>where Çukurova Holding is based and where the bulk of its assets are located</u>.  Sonera has not, and cannot, offer any legitimate reason for this.[7]

Finally, Sonera's request to "freeze" any funds that may be raised by Çukurova Holding in connection with its financing efforts is premature and not ripe for adjudication.  Sonera admits that such hypothetical funds are not currently the proper subject of a turnover order and seeks a turnover of such funds only *if* Çukurova Holding is able to raise them.  *See* Sonera Br. at 12 (Dkt. # 84).  Yet Sonera nonetheless seeks a restraint of those funds.  Because there is no basis for their turnover, there is also no basis for Sonera to ask the Court to freeze the funds or enjoin the future transfer of the funds.  The only purpose of this request an improper one:  to prevent the financing.

> C.   <u>Sonera's Unwillingness to Provide Security Pursuant to Fed. R. Civ. P. 65(c) Precludes Any Injunctive Relief</u>

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . <u>only if</u> the movant gives security in an amount that the court considers proper to pay the costs

---

[7]   Sonera stated in its initial Petition for Confirmation of a Foreign Award dated Dec. 6, 2011: "Applications for recognition, enforcement and other relief will be made in Çukurova's jurisdiction of incorporation, Turkey, imminently."  Sonera subsequently suggested that it had not filed for enforcement in Turkey because "the Swiss proceedings were not finally resolved until recently, i.e., when the Swiss court rejected Çukurova's reopener application at the beginning of May 2012.  It is only from this date that Sonera would be able to commence proceedings in Turkey without any potential impediment."  Declaration of Omur Yarsuvat ¶ 12 (Dkt. # 21).  It has been nearly one year since May 2012, and yet Sonera still has not commenced enforcement proceedings in Turkey.

and damages sustained by any party found to have been wrongfully enjoined or restrained"
(emphasis added).  Yet Sonera argues that it should be absolved from this requirement by virtue
of Çukurova Holding's purported "intransigence."  Sonera Br. at 18 (Dkt. # 84).

Sonera does not (and evidently cannot) cite any authority in support of this purported
"intransigence" exception to the requirement that a party seeking a preliminary injunction must
post proper security.  The reason is simple: no such exception exists.

Nor does the sole exception referenced in the cases Sonera relies on – the absence of any
likelihood that the party resisting the preliminary attachment will suffer harm – even arguably
apply here.[8]  On the contrary, if the Court were to grant the preliminary injunction Sonera seeks
– thereby destroying any possibility of obtaining the financing necessary to redeem the Turkcell
Shares – the resulting harm to Çukurova Holding will be devastating and irreparable because it
will have forever lost the possibility of redeeming the Turkcell Shares after six years of
litigation.  Given the lack of any legitimate basis for Sonera's injunction request, there is a clear
risk that any injunction the Court might issue will later prove to have been wrongfully issued.
Yet if the Court were to grant the preliminary injunction Sonera seeks – thereby destroying any
possibility of obtaining the financing necessary to redeem the Turkcell Shares – the resulting
harm to Çukurova Holding will be irreparable.  The Turkcell Shares are a unique irreplaceable
asset.  If Çukurova Holding is prevented from recovering them pursuant to the Privy Council's
order, Alfa's beneficial ownership of the Turkcell Shares will be confirmed, and they will be lost
to Çukurova Holding forever.

---

[8]   *See Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 136 (2d Cir. 1997) (district courts have
      "wide discretion . . . to dispense with the bond requirement *where there has been no proof of
      likelihood of harm"*) (emphasis added, internal citation and quotation omitted).

The potential damage to Çukurova Holding is staggering, as Sonera acknowledges.  *See* Sonera Br. at 3-4 (estimating that "the redemption amount will be between approximately $1.5 billion and $3 billion") (Dkt. # 84); Reynolds Decl. Ex. 2 – Karamehmet Aff. ¶ 46.  Given the clear and imminent risk that Çukurova Holding will suffer massive and irreparable harm if the Court grants the preliminary injunction, the Court should require Sonera to post a very significant bond commensurate with the sheer magnitude of the transaction Sonera seeks to thwart – the Çukurova Parties' redemption of the Turkcell Shares valued at *nearly $2 billion.*

**II.     Sonera's Claims For Injunctive Relief Against and Turnover of Assets Belonging to Third Parties That are Not Before This Court are Improper and Must be Denied**

      A.     <u>Controlling Second Circuit Precedent Bars Sonera From Litigating its Veil-Piercing Claims Against Mehmet Karamehmet and Various Çukurova Holding "Affiliates" in This Proceeding</u>

Sonera asks this Court to issue injunctive relief not only against Çukurova Holding – the judgment debtor and the only party that is before this Court – but also against its Chairman, Mr. Karamehmet, and various purported "affiliates" of Çukurova Holding, none of whom are parties to this proceeding.  Sonera also seeks the turnover of assets that belong to those non-parties.  Sonera's attempt to assert such claims against third parties in this confirmation proceeding contravenes clear Second Circuit precedent and should be denied.  *Glencore AG v. Bharat Aluminum Co.*, No. 10 Civ. 5251(SAS), 2010 WL 4323264, at *6 (S.D.N.Y. Nov. 1, 2010) (citing *Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama,* 312 F.2d 299, 301 (2d Cir. 1963)).

In *Orion,* the Second Circuit held that "an action for confirmation [of an arbitral award] is not the proper time for a District Court to 'pierce the corporate veil.'"  *Orion,* 312 F.2d at 301.  Accordingly, Sonera could pursue its claims against Mr. Karamehmet and the "affiliates," if at all, only by commencing "a separate action in which the[] other entities are named defendants in

16

order to pierce the corporate veil and find alter ego . . . liability." *NYKCool A.B. v. Pac. Fruit Inc.,* No. 10 Civ. 3867(LAK)(AJP), 2012 WL 1255019, at *5 (S.D.N.Y. Apr. 16, 2012); *see generally* CPLR 5225(b) (a judgment creditor must commence a special proceeding in order to reach "money or other personal property in which the judgment debtor has an interest" in the possession or custody of a person other than the judgment debtor).  In its prior submissions to this Court, Sonera itself has admitted that a new and distinct action would be required to assert any claims for veil-piercing.[9]

Where, as here, a judgment creditor alleges that third-party entities or individuals are alter egos of the judgment debtor, "fundamental notions of due process" require that the "nonparties must be accorded 'an opportunity to be heard and participate in . . . litigation' that could give rise to a judgment against them.'" *Motorola Credit Corp. v. Uzan,* 388 F.3d 39, 62 (2d Cir. 2004) (quoting *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985)); *accord. JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 295 F. Supp. 2d 366, 393 (S.D.N.Y. 2003) (the assets of purported alter egos "may not be restrained pursuant to [CPLR] § 5222 until their alleged alter ego status has been adjudicated and their liability for the previous judgment determined."); *Imagineering, Inc. v. Lukingbeal,* No. 94 Civ. 2589 (RLC), 1997 WL 363591, at *5 n.11 (S.D.N.Y. June 30, 1997) ("[A] judgment cannot be enforced against an alleged alter ego who has not had an opportunity to litigate whether or not such a relationship did exist.").[10]

---

[9]  *See* Letter from P. Van Tol to the Court, dated Dec. 13, 2012, at 2 (Dkt. # 53) (referring to the possibility that "Sonera [could] start *a new action* in the U.S. to enforce the Final Award (*such as an action to pierce the veil*)") (emphasis added).

[10]  The cases Sonera relies on confirm that a judgment creditor must commence a separate turnover action if it wishes to pursue claims against alleged alter egos of the judgment debtor. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,* 933 F.2d 131, 133-34 (2d Cir. 1991) (judgment creditor commenced separate action asserting equitable claims to pierce

Controlling Second Circuit precedent further requires Sonera to establish an independent basis in federal law for this Court's subject matter jurisdiction over its veil-piercing claims. An action to establish liability on the part of a third party "must have its own source of federal jurisdiction, so that absent an independent basis for federal jurisdiction a new defendant may not be haled into federal court." *Epperson v. Entm't Express, Inc.,* 242 F.3d 100, 104 (2d Cir. 2001). This requirement applies to "claims of alter ego liability and veil-piercing" because such claims "raise an independent controversy with a new party in an effort to shift liability." *Id.* at 106; *see also Peacock v. Thomas,* 516 U.S. 349, 357 (1996) ("We have never authorized the exercise of ancillary jurisdiction in a subsequent lawsuit to impose an obligation to pay an existing federal judgment on a person not already liable for that judgment.").[11] Yet Sonera has not even attempted to allege any independent federal law basis for its claims against Mr. Karamehmet and the affiliates here.[12]

Sonera's improper attempt to circumvent these important procedural safeguards is particularly egregious in light of Sonera's transparent goal of denying even Çukurova Holding *itself* an adequate opportunity to respond to its allegations. By bringing this Motion (or more precisely, four separate motions seeking four different forms of relief bundled into one

---

the judgment debtor's corporate veil); *JSC Foreign Economic Ass'n*, 295 F. Supp. 2d at 371 (judgment creditor "filed a new complaint initiating this action" against alleged alter egos of the judgment debtor). The only other case Sonera cites, *Motorola Credit Corp. v. Uzan,* 739 F. Supp. 2d 636 (S.D.N.Y 2010) involved "unusual circumstances" because the alleged alter egos in that case failed to appear before the district court despite a full and fair opportunity to do so. *Id.* at 638.

[11]  *Accord, e.g., C.G. Holdings, Inc. v. Rum Jungle, Inc.,* 582 F. Supp. 2d 385, 388 (E.D.N.Y. 2008) ("[C]ourts in this circuit have found that enforcement of a judgment against a third party that is predicated on alter-ego and veil piercing theories falls outside the ancillary jurisdiction of the court.").

[12]  Given that both Sonera and Çukurova Holding are foreign corporations, subject matter jurisdiction plainly cannot be based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

submission) in the form of an Order to Show Cause and creating a false sense of urgency, Sonera would have this Court issue an order against parties that are not even before the Court requiring them, *inter alia*, to turn over assets worth many hundreds of millions of dollars[13] based on unsubstantiated allegations and conjecture while limiting Çukurova Holding's time to respond to less than four days.  This Court should reject such gamesmanship.

### B.   No Factual Basis Exists for Sonera's Veil-Piercing Claims

Even were the Court to consider Sonera's veil-piercing claims, it is clear that Sonera cannot meet its "heavy burden" of establishing the elements necessary to support veil piercing under New York law.  *TNS Holdings, Inc. v. MKI Securities Corp.,* 92 N.Y.2d 335, 339 (1998).[14] The Second Circuit has instructed that "[c]ourts must be extremely reluctant to disregard corporate form and should do so only when the corporation *primarily* transacts the business of the dominating interest rather than its own."  *United States v. Funds Held in the Name or for the Benefit of Wetterer,* 210 F.3d 96, 106 (2d Cir. 2000) (citation omitted, emphasis in original).

Sonera has not even *alleged* (let alone established) a factual basis for its alter ego and veil-piercing theories.[15]  *First,* as to alter ego, Sonera's wholly conclusory assertion that

---

[13]   *See* Sonera Br. at 11 (Dkt. # 84).

[14]   Çukurova Holding does not concede that Sonera's veil-piercing claims are governed by New York law.  On the contrary, "[u]nder New York choice of law principles, [t]he law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders."  *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation and citation omitted, alterations in original).  Accordingly, Sonera's veil-piercing claims with respect to Çukurova Holding – a Turkish holding company – are governed by Turkish law.  Yet Sonera has proffered *no evidence whatsoever* concerning the requirements for veil-piercing under Turkish law, let alone that Sonera has any factual basis to state a claim for veil-piercing under Turkish law.

[15]   The relationship between alter ego and veil-piercing is that alter ego – if established – may constitute a *basis* to pierce the corporate veil.  *See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 17-18 (2d Cir. 1996) (a corporation's veil may be pierced where "the corporation has been so dominated by an individual or another corporation . . .

Çukurova Holding (which has no fewer than 45 different shareholders and is one of the best-known brands in Turkey with origins dating back to 1923[16]) is "one and the same"[17] as Mr. Karamehmet and/or the Karamehmet family strains credulity.   The fact that Mr. Karamehmet chairs Çukurova Holding, or even that he has influence over certain decisions of Çukurova Holding, does not mean that he is the alter ego of that company.   *Second,* as to veil piercing, Sonera all but admits that it lacks even a *prima facie* basis to make the required "showing that: '(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.'"   *Uzan,* 739 F. Supp. 2d at 640 (quoting *Morris v. N.Y. State Dep't of Taxation & Fin.,* 82 N.Y.2d 135, 141 (1993)).   Sonera does not allege any facts that could support the drastic step of disregarding the corporate form of Çukurova Holding and instead holding its Chair *personally liable* as if he himself were a judgment debtor.   Similarly, Sonera's request that this Court turn over assets or interests that belong to Mr. Karamehmet, or that it restrain the transfer or pledge of such assets, simply is not sustainable on this record.

Lacking any basis to support its unsubstantiated claims of domination and control, Sonera mischaracterizes various snippets from witness statements and testimony of Mr. Karamehmet in the BVI proceedings.   *First,* Sonera attempts to resurrect an argument based on Mr. Karamehmet's use of the term "Cukurova group" in a witness statement three years ago in the BVI proceeding, which Sonera attempts to portray as an "admi[ssion]" by Mr. Karamehmet that he "personally controls" Çukurova Holding and its affiliates.   Sonera Br. at 10 (Dkt. # 84).

---

and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.").

[16]   *See* Dkt. # 46-9, at 4.

[17]   Sonera Br. at 2 (Dkt. # 84).

Mr. Karamehmet said nothing of the kind. Indeed, Çukurova Holding previously debunked this very same argument in connection with its Motion to Vacate the Court's September 21 Judgment. As Çukurova Holding demonstrated there, Mr. Karamehmet used "Çukurova group" as a defined term for the specific purpose of his testimony in the BVI, and he explicitly defined that term as "the group of companies of which Çukurova Holding *is the head.*" (*See* Dkt. # 50, at 7). Among the entities Sonera references on pages 11-12 of its brief (Dkt. # 84), <u>only</u> CFI and CTH, neither of which is currently owned by Çukurova Holding,[18] and Baytur Insaat Taahhüt A.Ş. ("Baytur"), in which Çukurova Holding owns a 19% stake, are part of the "Çukurova group" as Mr. Karamehmet defined that term. None of the other entities identified by Sonera is part of the group of entities Mr. Karamehmet referred to as the "Çukurova group."

*Second,* Sonera contends that a more recent, March 21, 2013 affidavit of Mr. Karamehmet in the BVI proceeding purportedly "confirms the extent of his domination and control." Sonera Br. at 11 (Dkt. # 84). Once again, Mr. Karamehmet's affidavit confirms nothing of the kind. As Sonera concedes,[19] the purpose of Mr. Karamehmet's recent affidavit in the BVI was to rebut Sonera's assertion that Çukurova Holding and/or certain of its "affiliates," including its Chairman, Mr. Karamehmet, had other assets they could pledge as collateral for the financing required to redeem the Turkcell Shares (including each of the "assets" identified on page 11 of Sonera's current Memorandum of Law, Dkt. # 84). Therefore, Sonera argued, the

---

[18]   Çukurova Holding will gain (direct or indirect) ownership of these entities only if it can successfully redeem the Turkcell Shares in accordance with the Privy Council's judgment.

[19]   *See* Sonera Br. at 11 n.5 ("[T]he whole purpose of the [Karamehmet] affidavit was to show that the assets of these entities, by themselves, would not provide sufficient collateral for the financing of the Redemption Transaction.") (Dkt. # 84).

BVI Court was free to enjoin the pledging of the Turkcell Shares without endangering Çukurova Holding's ability to obtain such financing.

In response to Sonera's allegations concerning these potential assets, Mr. Karamehmet's affidavit sought to explain why, without the Turkcell Shares, the assets referred to by Sonera were insufficient to pledge as security for the financing.[20]   The BVI Court accepted this evidence.   Mr. Karamehmet did *not* state, nor did the BVI Court find, that any of the assets identified by Sonera were in fact controlled by Çukurova Holding.   On the contrary, as Mr. Karamehmet made clear, the assets identified by Sonera "include assets owned (directly or indirectly) by my family's interests, in which [Çukurova Holding] has no direct or indirect interest," and such assets "can only be pledged as collateral for [Çukurova Holding]'s purposes to the extent that I am able to procure such a pledge and to the extent of the interest that the Karamehmet family actually has in that asset."   Karamehmet Aff. at ¶ 63(a) (emphasis added). Accordingly, Sonera's assertion that Mr. Karamehmet somehow acknowledged that Çukurova Holding controls such entities (Sonera Br. at 11-12) is patently false.

As the foregoing demonstrates, Sonera's unsubstantiated allegations are based entirely on a mischaracterization of Mr. Karamehmet's testimony in the BVI proceedings.   In reality, Sonera has identified no basis whatsoever to pierce Çukurova Holding's corporate veil.   Accordingly, the Court should deny Sonera's request for extraordinarily far-reaching injunctive relief and a multi-hundred million dollar turnover order against individuals and entities that are not judgment debtors, are not parties to this proceeding, and are not before this Court.

---

[20]   *See* Karamehmet Aff. at ¶ 83 ("For the reasons set out above, the assets referred to by Sonera's counsel are not of a sufficient aggregate value to constitute effective collateral for the necessary loans.").

### III.    Sonera's Request for Increased Fines Is Improper and Baseless

Sonera asks the Court to impose an exponential increase of the contempt fines that were ordered against Çukurova Holding by this Court on March 11, 2013.  Sonera does not (and cannot) argue that increasing the fines this Court imposed just one month ago is somehow urgent.  This Court will recall that, on February 21, 2013 – just days after the Privy Council ruling was issued – Sonera first sought sanctions from this Court for Çukurova Holding's decision not to comply with the Court's discovery orders.  In those proceedings, Sonera highlighted that the fines might deter potential lenders from working with Çukurova Holding. Despite the fact that Sonera had requested substantially higher fines (i.e., $25,000 per day for the first week, $50,000 per day for the second week, and $100,000 per day for the third week, with the per day amount doubling each week thereafter), this Court, upon considering Sonera's arguments and evidence, ordered sanctions in the amount of $10,000 per weekday, rising to a maximum of $50,000 per weekday.  The Court said at the hearing that, if the fines proved futile after a passage of time, it might be willing to reconsider Çukurova Holding's argument that the sanctions were futile.  Gorskie Decl. Ex. 2 - Mar. 8 Hr'g. Tr. at 13-14.  In other words, the Court indicated that the reason for revisiting the fines would be to determine whether they should be lifted if they prove to be ineffective, not to increase them as Sonera seeks to do here.[21]

Sonera now asks the Court to increase those finds to an absurdly high number:  $150,000 per calendar day, doubling each day.  Sonera makes no new arguments and cites no new evidence to support such an exponential increase. There is absolutely no indication that increased fines will compel Çukurova Holding to change its position with respect to discovery.  Sonera's request for increased contempt fines is baseless and should be denied.

---

[21]    Sonera's counsel Mr. Van Tol has already acknowledged as much:  "What we need to do, your Honor, is have the order issued and then see if Çukurova is going to comply rather than have them say, we don't intend to comply."  Gorskie Decl. Ex. 2 – Mar. 8 Hr'g Tr. at 11:1-3.

## <u>CONCLUSION</u>

For the foregoing reasons, Çukurova Holding respectfully requests that the Court deny Sonera's Motion in all respects.

Dated: New York, New York
      April 12, 2013

                         Respectfully Submitted,

                         /s/ David M. Lindsey_____
                           David M. Lindsey
                           Andreas A. Frischknecht
                           Jennifer L. Gorskie

                         CHAFFETZ LINDSEY LLP
                         505 Fifth Avenue, 4th Floor
                         New York, NY 10017
                         Tel. (212) 257-6960
                         Fax (212) 257-6950
                         d.lindsey@chaffetzlindsey.com
                         www.chaffetzlindsey.com

                         *Attorneys for Çukurova Holding A.Ş.*